MESSAGE CENTER MANAGEMENT, INC. *v.*
COMMISSIONER OF REVENUE SERVICES*

Superior Court, Judicial District of New Britain, Tax Session
File Nos. CV-05-4006475S, CV-05-4006476S

* Affirmed. *Message Center Management, Inc.* v. *Commissioner of Revenue Services*, 282 Conn. 706, 923 A.2d 735 (2007).

Memorandum filed August 29, 2006

*Charles H. Lenore,* for the plaintiff.

*Louis P. Bucari, Jr.,* tax litigation director of the department of revenue services, for the defendant.

HON. ARNOLD W. ARONSON, JUDGE TRIAL REFEREE. The plaintiff, Message Center Management, Inc., brings the present tax appeal from the decision of the defendant, the commissioner of revenue services (commissioner), imposing a sales and use tax assessment, pursuant to the Sales and Use Tax Act, General Statutes § 12-406 et seq., upon the plaintiff for wireless business activities it conducted during the periods from January 1, 1996, through July 31, 1998, and from August 1, 1998, through December 31, 2001.

During the subject time periods, the plaintiff executed or had in effect with property owners various contracts that specified the plaintiff's business activities. A typical contract was named "management agreement," but contracts also existed under titles such as "master lease agreement" and "antenna license agreement." Hereinafter, the court will refer to the plaintiff's agreements collectively as management agreements.[1]

---

[1] Maria Scotti, the plaintiff's director, testified at trial that it was the plaintiff's position that "[a]s long as the business terms and conditions are fundamentally the same, it really doesn't matter to us what [the contracts are] called."

It is the commissioner's contention that the plaintiff's business activities pursuant to the management agreements are taxable because they come within the enumerated services provided in General Statutes § 12-407 (a) (37) (I).[2] The commissioner contends that, as the plaintiff "neither collected nor remitted sales tax on the consideration it received for performing its services under the contracts," she "determined said amounts to be additional gross receipts subject to tax." However, it is the plaintiff's position that "[the plaintiff] is a developer and operator of wireless communication sites for its own account. [The plaintiff] is not a manager of the property of third parties." Therefore, the issue here is whether the plaintiff's business activities under the management agreements constitute property management services, as provided in § 12-407 (a) (37) (1), to property owners' income producing real property.

While the commissioner relies upon the language of the various management agreements to claim that the plaintiff's activities are property management, the plaintiff defines its role under the management agreements by the discrete activities it performs vis-a-vis property owners and wireless carriers. The plaintiff maintains

[2] General Statutes § 12-407 (a) (37) provides in relevant part: " 'Services' for purposes of subdivision (2) of this subsection, means . . . (I) Services to industrial, commercial or income-producing real property, *including, but not limited to, such services as management* . . . and excluding any such services rendered in the voluntary evaluation, prevention, treatment, containment or removal of hazardous waste, as defined in section 22a-115, or other contaminants of air, water or soil, provided income-producing property shall not include property used exclusively for residential purposes in which the owner resides and which contains no more than three dwelling units, or a housing facility for low and moderate income families and persons owned or operated by a nonprofit housing organization, as defined in subdivision (29) of section 12-412 . . . ." (Emphasis added.)

General Statutes § 12-407 (a) (2) is also relevant here and provides that " '[s]ale' and 'selling' mean and include . . . (I) The rendering of certain services, as defined in subdivision (37) of this subsection, for a consideration, exclusive of such services rendered by an employee for the employer . . . ."

that the wireless carriers exist independent of the management agreements between the plaintiff and the property owners.

The plaintiff's typical business operations during the time periods in issue are as follows. The plaintiff would identify areas with gaps in coverage within existing wireless networks. Seeking to fill these so-called gaps by constructing wireless towers or placing antennas, the plaintiff surveyed these areas by car, employed engineering software, and located sites with height such as towers, flagpoles, rooftops, water towers, silos and trees.

As an example of the plaintiff's typical business operation, sections of the plaintiff's 2003 application to the Connecticut siting council for a certificate of environmental compatibility and public need are of particular significance here. The application was filed in order to construct, maintain and operate a facility consisting of a telecommunications tower, antennas and associated equipment that could be shared by at least three added carriers. In this application, the plaintiff stated that "[t]he primary purpose of the [f]acility is to fill AT&T's and other carriers existing coverage gaps to increase wireless call handling capacity in the East Haddam area." The plaintiff also stated in the application that the facility site would not only enable carriers to cover seven unserved areas, but also maximize the call carrying capacity of their systems.

Once potential antenna sites were identified, the plaintiff would review documents at the local municipality in order to identify the property owners and to ascertain whether the municipality would have a favorable position on the placement of antennas there. If the municipality appeared to have a favorable position, the plaintiff would then contact the property owner and

request use of that part of the property needed for its business.[3]

For an antenna site, the plaintiff usually negotiated a five year exclusive use of the site with an option for two or more five year renewals or extensions. The plaintiff often recorded these management agreements on the land records.[4] This signed agreement would appoint the plaintiff as the exclusive managing agent for the property owner of the site. Under a typical agreement, the property owner agrees to receive as consideration a percentage of licensing revenue the plaintiff collects from a wireless carrier that enters into a sublicense agreement with the plaintiff. Generally, a property owner agrees to receive 50 percent of the revenue, when received by the plaintiff, for use of the property by a wireless carrier, although the percentage could vary.[5] The plaintiff bears the financial risk in

---

[3] For example, a management agreement between the plaintiff and a property owner recites the following specific terms:

"Whereas, [o]wner is the lessee under a master lease for the building located at 411 West Putnam Avenue, Greenwich, Connecticut (hereinafter referred to as the '[b]uilding'). The [b]uilding and the land of which it is situated is referred to herein as the '[p]roperty.' The rooftop penthouse ('[p]enthouse') at the [b]uilding is hereby deemed suitable by [the plaintiff] for the placement of communications antennae and equipment.

"Whereas, [o]wner wished to utilize a section of the [p]enthouse to create an equipment shelter for communications equipment and to utilize the [p]enthouse walls and rooftop to facilitate the installation of communications antennae. Such shelter and [p]enthouse areas . . . and other portions of the [b]uilding in which [o]wner may allow [l]icensees . . . [to] install equipment (including without limitation, a portion of the 'C' level in the garage at the [b]uilding), are hereinafter collectively referred to as the '[s]ite.' "

A sublicense agreement is defined therein as a "[w]ritten agreement entered into by [the plaintiff] and a third party . . . and approved by [o]wner in accordance with this [a]greement, granting the third party the right to maintain antennas and related equipment at the [s]ite."

[4] Alternatively, if a site is suitable for the construction of a tower, the plaintiff negotiates with the property owner for the right to construct the tower.

[5] Compensation is calculated under a typical management agreement as follows: "(a) [The plaintiff] shall pay to the [o]wner, on a monthly basis, an amount ('[m]onthly [l]icense [f]ee') equal to the following percentage of the

developing and marketing the sites to wireless carriers. The plaintiff's hit rate in marketing sites is between 1.5 percent and 4 percent of properties in its inventory. The sales cycle for marketing sites to carriers could be as long as three years.[6] In some cases, the plaintiff incurred unreimbursed expenses.[7]

In addition, the terms of a typical management agreement would require the plaintiff to conduct the following activities: (1) promote the licensing of the site for the location of communications antennae and related equipment; (2) negotiate license agreements and renewals with new and existing licensees; (3) conduct the billing and collecting of licensing payments; (4) manage the technological and human relations aspects of the site; (5) manage the installation, removal and maintenance of licensee equipment at the site; (6)

---

[g]ross [c]ollected [r]eceipts . . . that were received by [the plaintiff] during the immediately preceding calendar month from or on behalf of each [l]icensee at the [s]ite:

"(i) 50 [percent] during the first five years of the term (as the same may be extended) of the [l]icensee's [s]ublicense [a]greement;

"(ii) 60 [percent] during the second five years of the term (as the same may be extended) of the [l]icensee's [s]ublicense [a]greement; and

"(iii) 70 [percent] during any period after the first ten (10) [years] of the term (as the same may be extended) of the [l]icensee's [s]ublicense [a]greement."

Once the plaintiff obtains payments from wireless carriers, the plaintiff retains its percentage, as designated in the management agreements, and then pays the balance due to the property owners. The property owners do not have any contact with the wireless carriers. Scotti testified at trial that "[o]nly if a carrier is operating at our wireless site, do we pay the property owner [a] percentage of that rental revenue."

[6] Maria Scotti, the plaintiff's director, testified at trial that "[i]t could be two or three years before a carrier may decide that they really do want to invest in a particular market over the long term. Or we may get one to start over the course of the year but not see any further tenants on that site for two or three years later."

[7] Maria Scotti, the plaintiff's director, testified that "[w]e actually have a site in Salem, Connecticut, that we built a tower on. And ultimately [it] did not get used by the carrier who originally had interest in it." The plaintiff also pays the property tax bills for sites and is not reimbursed by property owners.

manage the site consistent with applicable Federal Communications Commission and Federal Aviation Administration rules and regulations as well as observe the legal requirements of any governmental agency with jurisdiction over the site; (7) coordinate the use of the frequency spectrum to maximize the use of the site while minimizing interference problems; and (8) ensure licensee compliance with the reasonable rules and regulations governing the site concerning the site's security and accessibility.

Notably, there are provisions in a typical management agreement that provide for the plaintiff to carry and maintain, at its own expense, comprehensive commercial general liability insurance with general aggregate coverage of $2 million that list the property owner and others reasonably requested by the owner to be named as additional insureds. Furthermore, typical management agreements provide for the plaintiff to indemnify the owner and other related parties, including shareholders, directors, employees, contractors, agents and affiliates, as well as successors and assigns, against all claims of liability and damages as well as indemnification against any suits, claims and demands of every kind.

As discussed previously, after finalizing a management agreement with a property owner, the plaintiff seeks wireless carriers to enter into sublicense agreements for use of the site. Once the plaintiff obtains a carrier for a particular site, the plaintiff negotiates a license agreement between itself, the property owner and the wireless carrier. At this time, the plaintiff also charges the carrier a onetime facility coordination fee, which the plaintiff solely retains. The plaintiff collects additional fees from the carrier for providing engineering studies for governmental compliance requirements. Notably, the plaintiff charges the carrier sales

tax on the facility coordination fee and on the engineering studies because it views them as taxable services.

Our Supreme Court recognized in *AirKaman, Inc.* v. *Groppo*, 221 Conn. 751, 757, 607 A.2d 410 (1992), that " 'management services' was not defined in the Sales and Use Taxes Act," and therefore, "turn[ed] to the dictionary definition of the operative word, 'management,' to find its commonly approved meaning. 'Management' has been defined as 'the conducting or supervising of something (as a business); esp: the executive function of planning, organizing, coordinating, directing, controlling, and supervising any industrial or business project or activity with responsibility for results.' Webster's Third New International Dictionary. Because actual operation of something is a commonly approved meaning of the word 'management,' the words 'management services' in [§ 12-407 (a) (37) (J)] logically comprehend such an activity." In *AirKaman, Inc.*, the court concluded that the "actual [day-to-day] operation of a business is included within the term 'management services' " under the Sales and Use Tax Act. Id., 762.

After an initial examination of a typical management agreement between the plaintiff and a property owner, it might appear at first blush that the language therein describes the performance of management services as provided in § 12-407 (a) (37) (I). As the plaintiff argues in its posttrial brief, however, the commissioner's own regulations, namely, § 12-407 (2) (i) (J)-1 (c) (1) of the Regulations of Connecticut State Agencies, takes the position that she will not elevate form over substance. This regulation provides in relevant part that "[i]t is the nature of the services being rendered, and not what those services are called or termed by the service provider or service recipient, that determines whether services described in section [12-407 (a) (37) (J)] of the

general statutes are being rendered. . . ." Regs., Conn. State Agencies § 12-407 (2) (i) (J)-1 (c) (1).

Although the commissioner argues that the plaintiff's reliance on this regulation is misplaced, this court finds that this regulation and the discussion in *T.W.L.S. Management Co.* v. *Gavin*, 46 Conn. Sup. 401, 404, 754 A.2d 222 (1999), aff'd, 253 Conn. 452, 753 A.2d 361 (2000), are pertinent in the present appeal. In *T.W.L.S. Management Co.*, the trial court stated that "[t]o resolve the issue in this case we must determine just what the services were that were provided by the plaintiff to the owner. [T]he applicability of the tax in this case depends upon a determination of the true object of the underlying transaction. . . . [T]he commissioner's own administrative interpretations of related statutory provisions have regularly invoked an essence of the service test to determine the applicability of the sales and use tax." (Citation omitted; internal quotation marks omitted.) Id.

In its presentation of the evidence, the plaintiff offered the testimony of Maria Scotti, the plaintiff's director, and Joseph DeMaio, the chief financial officer of Cornerstone Properties, which manages shopping centers and apartment buildings, to distinguish the duties it performed under its management agreements with those duties performed by a typical property manager. Of the eighteen comparisons that Scotti and DeMaio discussed, the most significant comparisons differentiated between the services that a typical property manager would provide and the plaintiff's property interests and business activities on the relevant sites. A typical property manager (1) is engaged by and is paid by the property owner; (2) does not provide insurance protection for the property owner; (3) has a short-term arrangement for the management of the property; (4) does not pay for operational expenses, marketing expenses or improvements to the property; and (5) does not contract in his or her own name with vendors.

The true object of the plaintiff's business operations is to identify antennae sites and eliminate gaps in the wireless network in order to enhance wireless carriers' business operations. Even though the plaintiff negotiates for the limited use of a particular site by way of a license agreement, the property owner continues to have use and control of his or her property subject only to a future, limited use by wireless carriers. Under these circumstances, a two step agreement is created in which the property owner grants the plaintiff a license to place an antenna on the property and the plaintiff enters into a sublicense agreement with wireless carriers for use of the site for wireless transmissions.[8] If the plaintiff is unable to obtain a wireless carrier for the site, the plaintiff has no obligation to pay the property owner. It is significant that consideration under the typical license agreement flows from the wireless carrier to the plaintiff and that the plaintiff then splits payments of consideration with the owner. In contrast, under a typical property management agreement, the consideration (consisting of payment for services performed) flows from the property owner to the property manager.

In considering the legal relationships between the property owner, the plaintiff and the wireless carrier, it is necessary to define what these relationships are. The plaintiff characterizes the relationship between itself and the property owner as a license agreement and the relationship between itself and the wireless carrier as a sublicense. These relationships are also defined, for example, in the antenna license agreement.

"[A] license in real property is a mere privilege to act on the land of another, which does not produce an

---

[8] The court disagrees with the commissioner's argument that the agreements between the plaintiff and the wireless carriers are third party agreements that are not relevant in the present appeal. It is the commissioner's position that the sole issue in these appeals is the taxability of the transactions between the plaintiff and the property owners.

interest in the property . . . ." (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, 90 Conn. App. 662, 674, 879 A.2d 486 (2005). "On the other hand, [a] lease is a contract under which an exclusive possessory interest in property is conveyed. . . . A lease is more than a mere license; it is a contract for the possession and profits of lands and tenements on the one side, and a recompense of rent or other income on the other; or, in other words, a conveyance to a person for life, or years, or at will, in consideration of a return of rent or other recompense. . . . Its distinguishing characteristic is the surrender of possession by the landlord to the tenant so that he may occupy the land or tenement leased to the exclusion of the landlord himself." (Citations omitted; internal quotation marks omitted.) *Murphy, Inc.* v. *Remodeling, Etc., Inc.*, 62 Conn. App. 517, 522–23, 772 A.2d 154, cert. denied, 256 Conn. 916, 773 A.2d 945 (2001).

In *Murphy, Inc.*, the court found that the unambiguous language of an agreement titled " '[l]ease [a]greement' " did not indicate any intention to surrender exclusive possession of the premises despite containing "words customarily used in a lease, i.e., 'lessor,' 'lessee' and 'lease,' " and therefore, was not a lease but a license. Id., 524. Under the agreement in *Murphy, Inc.*, the plaintiff obtained the " 'exclusive right of servicing . . . [s]igns, and to hang scaffolds, or to construct, post, paint, illuminate, repair or remove its advertisements on the [s]igns' " on the rooftop of the property owner's building, and " 'the right of ingress and egress into and over the [p]remises to gain access to the [s]igns.' " Id., 523. Because the agreement in *Murphy, Inc.*, did not expressly grant possession of the premises and was merely limited to the right to service the signs and a right of ingress and egress over the premises to gain access to the signs, the court found that a license was created. Id., 524. Consistent with the

concept of possession, a typical management agreement of the plaintiff, as exemplified by the antenna license agreement, specifically provides that the plaintiff will have a nonexclusive license with the owner for possession of the site to place and operate telecommunications equipment.

Upon analysis of the facts in this case, it is clear to the court that the dominant economic characteristics of the transaction between the plaintiff and the property owner is the development by the plaintiff, at its own expense and risk, of a portion of an owner's property into a wireless communication site for the benefit of wireless carriers. The plaintiff's activities cannot be classified as "management services" as provided in § 12-407 (a) (37) (I) because the plaintiff does not provide management services to the property owner. Instead, the plaintiff is a source of income for the nonexclusive use of a portion of the owner's property paid for by a wireless carrier.

Accordingly, because the court does not find that the activities of the plaintiff are "management services" as provided in § 12-407 (a) (37) (I), judgment may enter in favor of the plaintiff sustaining its appeal without costs to either party.