THEODORE B. MULLE, JR., ET AL. *v.* BRIAN
MCCAULEY ET AL.
(AC 27604)

Bishop, Lavine and Mihalakos, Js.

Argued April 16—officially released July 31, 2007

*Gerald L. Garlick,* with whom, on the brief, was *Katherine E. Abel,* for the appellants (defendants).

*Patrick E. Power,* for the appellees (plaintiffs).

BISHOP, J. The defendants, Brian McCauley, Miyako Kinoshita, Mortgage Electronic Registrations Systems, Inc., and Loancity.com, appeal from the judgment of the trial court, rendered in favor of the plaintiffs, Theodore B. Mulle, Jr., and Denise D. Mulle. On appeal, the defendants claim that the court improperly determined that the plaintiffs had acquired title to a portion of their property by adverse possession. We affirm the judgment of the trial court.[1]

The following facts and procedural history, as set forth by the court in its memorandum of decision, are relevant to our consideration of the defendants' appeal. "The plaintiffs . . . are record title owners of a certain parcel of land situated in . . . New Milford . . . commonly known as 201 Aspetuck Ridge Road, hereinafter referred to as '[lot] 201.' The defendants . . . are record owners of a certain parcel of land . . . commonly known as 193 Aspetuck Ridge Road, hereinafter referred to as '[lot] 193.' . . . The disputed area comprises the north portion of [lot] 193 and extends in an east-west direction all the way from the front of [lot] 193 on Aspetuck Ridge Road to the rear westerly border of [lot] 193. . . . Rosemary Jejer came into possession of [lot] 201 in 1950 when she and her then husband, Philip Jejer, acquired [lot] 201 from Philip Jejer's parents, Frank Jejer and Daisy Jejer. Although Rosemary Jejer and Philip Jejer divorced in 1986, Rosemary Jejer continuously owned and occupied [lot] 201 from 1950 until December, 2000, when the property was sold to the plaintiffs. . . .

"Frances Hill received [lot] 193 by warranty deed from her mother, Daisy Jejer, on June 21, 1984. Up until

---

[1] Because we affirm the court's judgment as to the adverse possession claim, we need not reach the defendants' claim regarding a prescriptive easement.

approximately that date, Daisy Jejer resided at [lot] 193. After her acquisition of [lot] 193, Hill rented [lot] 193 to various tenants. From 1984 up until the time of the defendants' purchase, neither Hill nor any Jejer family member resided at [lot] 193. . . . Sometime prior to 1950, Frank Jejer and Daisy Jejer owned [lots] at 191, 193 and 201 Aspetuck Ridge Road. All three properties are adjoining. [Lot] 193 is located south of [lot] 201, and [lot] 191 is south of [lot] 193. All three properties are on the westerly side of Aspetuck Ridge Road. . . . The actual record boundary lines of [lots] 193 and 201 are not in dispute. . . . Further, there is no dispute that the defendants are the record title owners of the disputed area. . . .

"Simultaneous with their acquisition of [lot] 201, Rosemary Jejer and Philip Jejer began to use and maintain the disputed area. There was no evidence offered at trial that indicated that Rosemary Jejer's and Philip Jejer's initial use of any part of the disputed area was with either permission or consent, expressed or inferred, from the owners of [lot] 193.

"From 1950 to 1960, Rosemary Jejer and Philip Jejer leased the westerly portion of the disputed area to Fred Stebbins. Stebbins used the disputed area to pasture his cows. Stebbins pastured five to six cows in the disputed area for a decade and paid the Jejers a fee for the use of the disputed area. Additionally, through the years, while raising their three children, the Jejers themselves pastured horses and small farm animals in this westerly portion of the disputed area.

"In 1970, Rosemary Jejer and Philip Jejer installed a combination dirt and gravel driveway within the disputed area. The driveway begins in the northeasterly corner of [lot] 201 and traverses [lot] 201 in a southwesterly path through the disputed area before turning northwesterly through the disputed area back into [lot]

201, approaching the rear of the dwelling on [lot] 201. This driveway has, at all times relevant herein, provided access to [lot] 201 only and was exclusively used by only the occupants of [lot] 201. There was never any common use or sharing of this driveway with [lot] 193 or any of [lot] 193's occupants. [Lot] 193 at all times relevant herein had its own driveway. There was no evidence offered that Rosemary Jejer's and Philip Jejer's initial use of this portion of the disputed area was permissive or with the consent of the owners or occupiers of [lot] 193. Rosemary Jejer and Philip Jejer never sought permission to install the driveway, and none was ever given. Rosemary Jejer testified that they never sought permission to install the driveway because they had always assumed that the disputed area was part of [lot] 201. The driveway in the disputed area has always been maintained, including plowing and mowing, by the occupants of [lot] 201. Further, the plaintiffs have hired someone to mow the grassy area bordering the driveway within the disputed area. Grass clippings and leaves are deposited in the southeasterly corner of the disputed area.

"To this date . . . the driveway still exists and is clearly defined and visible from Aspetuck Road. Looking at [lot] 193 and [lot] 201 from Aspetuck Road, the driveway in the disputed area would clearly appear to be associated with [lot] 201, only, in that to the southerly side of the driveway is brush and green overgrowth, which appears to function as a natural boundary between [lot] 193 and [lot] 201. The plaintiffs have continued to use and maintain the driveway since their purchase of [lot] 201.

"In 1972, Rosemary Jejer and Philip Jejer constructed a two-story barn partially within the disputed area . . . . The barn still stands on the property today. The barn housed various farm animals, including goats and horses, until approximately 1987. At all times relevant

herein, this two-story barn has or should have been clearly visible to the occupants or owners of [lot] 193 or anyone else who came upon the property for that matter. No one else used the barn except the owners of [lot] 201. . . . The record title boundary line, going east and west between [lot] 193 and [lot] 201, cuts right through the middle of the barn, thus one half of the barn is within the disputed area, and the other half is within the record title boundary of [lot] 201."

The record reveals that the plaintiffs purchased lot 201 from Rosemary Jejer on December 20, 2000, and the defendants purchased lot 193 from Hill on April 21, 2003. A dispute arose when subsequent to the purchase of lot 201 by the plaintiffs, Robert Hill showed Theodore Mulle, Jr., a 1984 land survey, which revealed the true boundary lines of the adjacent properties. Theodore Mulle, Jr., immediately contacted his attorney in an attempt to resolve this newly discovered problem regarding the boundary between the two lots.

While the plaintiffs were trying to resolve this issue, Frances Hill sold lot 193 to the defendants in April, 2003. Although the defendants had seen a copy of the 1984 land survey prior to the closing, they were not aware of the discrepancies between the survey and the actual use of the property. The defendants first learned of the boundary discrepancy in May, 2003, when they received a letter from the plaintiffs' attorney notifying them of the boundary dispute.

By way of substitute complaint filed February 18, 2005, the plaintiffs sought a decree determining the rights of the parties as to the disputed area. In its memo-randum of decision filed April 3, 2006, the court found, inter alia, that the plaintiffs had established all of the elements necessary for an adverse possession claim and, accordingly, quieted title in favor of the plaintiffs.

This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendants contend that the hostility and exclusivity elements of adverse possession were not satisfied. We are not persuaded.

As a preliminary matter, we identify the applicable legal principles. It is well established that one claiming title to real property by adverse possession must prove by clear and positive evidence each element of actual, open, notorious, hostile, continuous and exclusive possession for the full fifteen year statutory period. See *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, 93 Conn. App. 759, 779–80, 890 A.2d 645 (2006); see also General Statutes § 52-575 (fifteen year statute of limitations for claim of adverse possession).

"Despite [this] exacting standard, our scope of review is limited." (Internal quotation marks omitted.) *Provenzano* v. *Provenzano*, 88 Conn. App. 217, 222, 870 A.2d 1085 (2005). "Because adverse possession is a question of fact for the trier . . . the court's findings as to this claim are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Citations omitted; internal quotation marks omitted.) *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 779. With these principles in mind, we address the defendants' specific claims on appeal.

The defendants first claim that the court improperly found that the use of the disputed area by the owners and occupants of lot 201 was hostile. Specifically, the defendants argue, pursuant to *Woodhouse* v. *McKee*, 90 Conn. App. 662, 879 A.2d 486 (2005), that because the original owners of lots 193 and 201 were related, a presumption of permissive use arose regarding the presently disputed lot, and because this presumption was not clearly repudiated, the plaintiffs failed to demonstrate that the use of the disputed area was hostile. In contrast, the plaintiffs argue that they presented sufficient facts demonstrating that the use of the disputed area was hostile and that a familial relationship of abutting landowners, by itself, is not sufficient to give rise to an automatic presumption of permissive use. The trial court agreed with the plaintiffs. Although the defendants are correct in their assertion that the holding of *Woodhouse* has bearing on the issues at hand because the original occupants of lots 193 and 201 were related, we agree, nevertheless, with the court that an automatic presumption of permissive use is not mandated in this instance because a familial relationship is only one factor to consider in the hostility analysis, and the facts of the present matter are significantly distinguishable from the facts in *Woodhouse*.

In *Woodhouse*, the plaintiffs' and the defendant's parcels originally were owned by Archibald Young as a single parcel. Id., 669–71. In 1928, a summer cottage was built on the property. Id., 666. In 1929, Young conveyed what was to become the "McKee parcel," consisting of 35.5 acres, to his daughter, Mary Kettles, and her husband, John Kettles. Id., 669–70. Young reserved to himself two remaining acres of the original parcel containing the summer cottage, which later became the "Woodhouse parcel." Id., 669. This smaller Woodhouse parcel shared a driveway that was located entirely within the McKee parcel, but was used for access to

the Woodhouse parcel as well as to the McKee parcel. Id., 674. "The shared driveway . . . was used by both parcels until the 1940s." Id. In 1935, Young transferred his remaining interest in the Woodhouse parcel to his other daughter, Dorothy Young Kirk. Id., 669–70. The terminus of this driveway, which was shared by both parcels and located within the McKee parcel, was the disputed area in *Woodhouse*. Id., 672. No express permission was given to Young or later owners of the Woodhouse parcel to use the shared driveway or its terminus. Id., 671–74. It was not until the 1940s that a new driveway was installed on the Woodhouse parcel. Id., 671. It joined part of the old driveway and continued to terminate at the disputed area. Id. The occupants of the Woodhouse parcel, with the knowledge that the disputed area was located within the McKee parcel, continued to use the driveway and its terminus as they always had done. Id.

The defendant became the owner of the McKee parcel in 1992. Id., 667. Subsequently, a dispute arose regarding use of the driveway and its terminus. The owners of the Woodhouse parcel claimed that they and their predecessors had acquired ownership of the disputed area by adverse possession. Id., 664. Conversely, the defendants claimed that the plaintiffs' and their predecessors' use of the disputed area had been with the permission or consent of the owners of the McKee parcel. Id., 665.

This court in *Woodhouse* opined that "[t]he original familial ownership of these adjacent properties directly affects the analysis of [the defendant's] claim that the use of the disputed area was permissive and not hostile or adverse." Id., 670–71. In reversing the trial court's finding of adverse possession, this court, quoting 3 Am. Jur. 2d 124, Adverse Possession § 180 (2002), stated: "It is a general principle that members of a family may not acquire adverse possession against each other in the absence of a showing of a clear, positive, and continued

disclaimer and disavowal of title . . . . The existence of a family relationship between the parties will prevent or rebut a presumption of adverse holding." (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, supra, 90 Conn. App. 673. "In determining what amounts to hostility, the relation that the adverse possessor occupies with reference to the owner is *important*. If the parties are strangers and the possession is open and notorious, it *may* be deemed to be hostile. *However if the parties are related, there may be a presumption that the use is permissive*." (Emphasis added; internal quotation marks omitted.) Id.

This court in *Woodhouse* determined that the trial court improperly concluded that the plaintiffs had established their adverse possession claim because "the court failed to consider the relevance of the initial grantor-grantee or parent-child familial use of the disputed area." Id., 676. This court also stated, however, that "[a]lthough [the trial court] recognized that the property initially was owned by Young and then by his children, it did *not consider the shared use of the driveway* and the presumptive license given to the plaintiffs or their predecessors in title to use the disputed area . . . ." (Emphasis added.) Id.

The court in the present matter stated that "[t]he case at bar gives rise to a *Woodhouse* analysis since the original relationship between the abutting property owners at [lots] 193 and 201 was familial." In response to the defendants' motion for articulation, the court commented, however, that "[a]lthough the court did analyze the facts of the case at bar pursuant to *Woodhouse* . . . it found that the case at bar did not give rise to the application of the *Woodhouse* presumption."

The court explained in its memorandum of decision that "[a]side from the familial relationship between the original owners of [lots] 193 and 201, the facts in the

case at bar are significantly distinguishable from the relevant underlying facts in *Woodhouse*. Most importantly, in *Woodhouse*, there was evidence that the claimants had permission to use the area in dispute from inception. Further, there was evidence of a shared use of the disputed area between the abutting property owners. Neither of these pivotal facts is present in the case before the court. The plaintiffs in this case were never granted permission or consent, expressed, inferred or otherwise, to use the disputed area. Additionally, there was no evidence of any shared use of any portion of the disputed area. The fact that [lots] 193 and 201 were at one time owned and occupied by members of the same family, does not, alone, give rise to the presumption of permissive use."

The court continued in its articulation, stating that "[t]he *Woodhouse* court clearly stated the presence of a familial relationship *may* give rise to a presumption of permissive use. First finding a familial relationship between the abutting property owners, the *Woodhouse* court went on to analyze the facts relative to the initial and historical use of the disputed area. Only after the court found shared and communal use of the disputed area since its inception did the court find the application of the presumption appropriate." Thus, in its memorandum of decision, the court concluded: "Given the relevant facts of this case, application of the *Woodhouse* presumption would be inappropriate. Accordingly, having met all the other necessary elements of their claim, the court finds in favor of the plaintiffs on the first count of their complaint sounding in adverse possession."

As a general proposition, to satisfy the hostility requirement of adverse possession, a claimant's possession of the disputed land, from its inception, must be

without permission, license[2] or consent[3] of the owner and must continue to be so throughout the required fifteen year period.[4] *Woodhouse* v. *McKee*, supra, 90 Conn. App. 672–73; see also *Paton* v. *Robinson*, 81 Conn. 547, 551, 71 A. 730 (1909).

"The word 'hostile,' as employed in the law of adverse possession, is a term of art; it does not, despite some troublesome early cases, imply animosity, ill will or bad faith. Nor is the claimant required to make express declarations of adverse intent during the possessory period. Conversely, in order to obtain title by adverse possession one need not be under a good faith mistake that he or she had legal title to the land." 16 R. Powell, Real Property (2005) § 91.05 [1]. "Hostile possession can be understood as possession that is opposed and antagonistic to all other claims, and that conveys the clear message that the possessor intends to possess the land as his or her own." Id.

"Historically, the existence of a familial relationship between claimants has been [only] a factor in determining whether possession of land is adverse . . . ." (Citations omitted.) *Totman* v. *Malloy*, 431 Mass. 143, 145–46, 725 N.E.2d 1045 (2000). A "family relationship between parties is only one of the facts to be considered [with

---

[2] "[A] license in real property is a mere privilege to act on the land of another, which does not produce an interest in the property . . . ." (Internal quotation marks omitted.) *Top of the Town, LLC* v. *Somers Sportsmen's Assn., Inc.*, 69 Conn. App. 839, 845, 797 A.2d 18, cert. denied, 261 Conn. 916, 806 A.2d 1058 (2002).

[3] "The word 'consent' has been used in the legal analysis of claims of adverse possession to negate the necessary element of hostile possession." *Gallo-Mure* v. *Tomchik*, 78 Conn. App. 699, 706, 829 A.2d 8 (2003).

[4] We also note that "[p]ossession that is permissive in its inception [however] may [still] become hostile." (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, supra, 90 Conn. App. 675. "[I]t does so only if [the permission] is clearly repudiated by the occupant [or owner]. . . . Such repudiation must be shown by some clear, positive, and unequivocal act brought home to the owner or the use will be presumed to be permissive." (Citations omitted; internal quotation marks omitted.) Id.

other facts]. . . . [A] family relationship without more is insufficient to support a finding that the use at the time was with permission." (Citations omitted; internal quotation marks omitted.) *Banks* v. *Pusey*, 393 Md. 688, 705–706, 904 A.2d 448 (2006). "[S]tanding alone a familial relationship neither puts an end to the inquiry regarding permissive use nor shifts the burden of proof." *Totman* v. *Malloy*, supra, 148. "Nevertheless, the familial relationship may be an important factor when evaluated in the context of all the other relevant factors guiding the Court in its resolution of the . . . claim." *Brown* v. *Houston Ventures*, Docket No. Civ. A. 2046-S, 2003 WL 136181, *6 (Del. Ch. January 3, 2003).

Here, it is undisputed that the original owners of lots 193 and 201 were related, and, as the court correctly noted, this fact triggers the need for a *Woodhouse* analysis. Contrary to the defendants' contention, however, this fact alone does not mandate the automatic presumption of permissive use enunciated in *Woodhouse.* As noted, this court in *Woodhouse* stated that the trial court failed to consider the familial use of the disputed area. The *Woodhouse* court did not, however, base its conclusion solely on the family relationships among the original property owners. Rather, the court considered the familial relationship of the adjacent landowners *in conjunction with* the shared use of the driveway in determining whether to apply a presumption of permissive use. This reflects the court's conclusion that a familial relationship between abutting landowners is but one factor to consider in the hostility analysis.[5] In

---

[5] We also note that this reading of *Woodhouse* is further supported by the fact that this court in a subsequent case quoted *Woodhouse*, stating that "in assessing whether hostility exists, the relation that the [alleged] adverse possessor occupies with reference to the owner is important." (Internal quotation marks omitted.) *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 775. We note that the term "important" is not synonymous with "determinative" and that the *Woodhouse* court did not state that the existence of a family relationship among original owners was the sole factor to be considered in a hostility analysis. Important is defined as "marked by or possessing weight or consequence . . . significant. . . ."

this appeal, unlike *Woodhouse*, the trial court made a specific factual finding that there was an absence of a shared or communal use of the disputed area since the beginning or any time thereafter. Thus, the court properly concluded that there was a significant factual distinction between *Woodhouse* and the case at bar because of the absence of a history of shared use in this matter and, correspondingly, the presence of shared use in the *Woodhouse* record.

In addition to its determination that the presumption of permissive use did not apply, the court specifically found that (1) in 1972, Rosemary Jejer and Philip Jejer constructed a barn partially within the disputed area, which was never shared with the occupants of lot 193 and exclusively used by the occupants of lot 201, and "[t]he driveway in the disputed area has always been maintained, including plowing and mowing, by the occupants of [lot] 201," (2) Rosemary Jejer and Philip Jejer installed a driveway that ran through the disputed area and was exclusively used by them, (3) Rosemary Jejer and Philip Jejer rented out the disputed area for their exclusive benefit, and (4) Rosemary Jejer and Philip Jejer also pastured horses and farm animals within the disputed area. The court observed, in contrast with the *Woodhouse* facts, that in the entire fifty year history of the adjoining parcels, other than the evidence that Daisy Jejer would on occasion walk through the disputed area in order to visit the occupants of lot 201 and that the Jejer grandchildren played on all three lots on occasion as children, "there was no evidence that anyone other than the occupants and owners of [lot] 201 used or maintained the disputed area." These facts support the court's conclusion that the use of lot 201 by the plaintiffs' predecessors was open and hostile.

---

Determinative is defined as "having power or tendency to determine . . . conclusive." Webster's Third New International Dictionary.

In sum, the court correctly determined that the use of the disputed area was hostile and that the presumption of permissive use as set forth in *Woodhouse* was inapplicable to the facts at hand. Accordingly, we conclude that the court's determination faithfully adheres to the legal principles relating to hostile possession and that the court's findings are supported by the record and are not clearly erroneous.[6]

The defendants also claim that the plaintiffs' assertion of title by adverse possession must fail because the evidence presented to the court demonstrated that the plaintiffs' use of the disputed area was not exclusive. We disagree.

"Again, the question of whether the elements of an adverse possession claim have been established by clear and convincing evidence is a factual one subject to the clearly erroneous standard of review." *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 785. "In general, exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating land to his own use and the exclusion of others. . . . Thus, the claimant's possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use. . . . It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question." (Citations omitted; internal quotation marks omitted.) *Roche* v. *Fairfield*, 186 Conn. 490, 502–503, 442 A.2d 911 (1982).

---

[6] Because we agree with the court's conclusion that the presumption of permissive use did not apply in the present matter and that the use of the disputed area was hostile since its inception, we need not address the defendant's argument that the plaintiffs' predecessors never clearly repudiated the initial permissive use of the property.

We agree with the defendants' contention that shared dominion defeats a claim of adverse possession. See *Lisiewski* v. *Seidel*, 95 Conn. App. 696, 702, 899 A.2d 59 (2006) ("[i]f dominion is shared, then the exclusivity element of adverse possession is absent"). In the present matter, however, the record amply supports the court's conclusion that the occupants of lot 201 used the disputed area exclusively as owners of such property would.

The record reflects that throughout the time period in question, the occupants of lot 201 (1) exclusively maintained and paid for the maintenance of the disputed area, (2) constructed a barn partially within the disputed area, (3) rented out the westerly portion of the disputed area,[7] (4) pastured their farm animals within the disputed area and (5) installed, maintained and exclusively used a driveway that ran through the disputed area. These activities are all consistent with open acts of ownership by the occupants of lot 201. Conversely, the only evidence the defendants offered in this regard was their testimony that since their purchase, they tapped a maple tree in an area that they believe was within the disputed area. There was no testimony, however, as to whether this activity was done with the plaintiffs' knowledge or permission. The defendants did not offer any other evidence relative to their use or maintenance of the disputed area. Thus, the court's conclusion that the plaintiffs established that their use and their predecessor's use of the disputed area was exclusive was not clearly erroneous, as it is adequately supported by the evidence.

We conclude that the record contains ample evidence to support the court's finding that the plaintiffs had

---

[7] The rent received by Philip Jejer and Rosemary Jejer from Stebbins was never paid to Daisy Jejer or shared with her. Rosemary Jejer testified that the rental agreement was between herself, her husband and Stebbins, and that "Daisy [Jejer] had nothing to do with it."

proven each and every element of adverse possession for well over fifteen years by clear and convincing evidence and that the plaintiffs are therefore the owners of the disputed area.

The judgment is affirmed.

In this opinion the other judges concurred.