HARRIET WOODHOUSE *v.* MARK D. MCKEE
(AC 25909)

Schaller, Flynn and Gruendel, Js.

Argued May 26—officially released August 9, 2005

*Charlotte Croman,* for the appellant (defendant).

*John K. Atticks III,* for the appellees (plaintiffs).

*Opinion*

FLYNN, J. The defendant, Mark D. McKee, appeals from the judgment of the trial court rendered in favor of the plaintiffs, Harriet Woodhouse, Pamela Benn and John Woodhouse, on their claim of adverse possession. On appeal, McKee claims that the court improperly (1) concluded that the plaintiffs had presented clear and convincing evidence of adverse, i.e., hostile, possession, (2) failed to conclude that the plaintiffs' recognition of title in McKee and his predecessors in title precluded their claim of adverse possession and (3) found in favor of the plaintiffs despite their failure to describe precisely the disputed area, and, as part of its decision, then ordered the parties to determine the exact area

subject to adverse possession. Agreeing with McKee's first claim,[1] we reverse the judgment of the trial court.

The following facts are relevant to our determination of the issues on appeal. The plaintiffs and McKee own adjacent parcels of land in the town of Madison. The plaintiffs are the owners of 246 Durham Road, and McKee is the owner of 252 Durham Road.[2] The plaintiffs filed their amended complaint on May 26, 2004. The first count of the amended complaint sounded in adverse possession.[3] The plaintiffs claimed that they had been in "uninterrupted possession and occupancy" of an adjacent piece of property, which had been "open, visible and exclusive, without license or consent of the defendant, and under a claim of right" for more than fifteen years. They referred to this piece of property as the "parking and well parcel." They further claimed that they or their predecessors in title actually had used this parking and well parcel continually for approximately seventy years for parking and as a vehicle turnaround. The plaintiffs also alleged that Harriet Woodhouse had used the parking and well parcel continually "since 1984 as a site for the well that serves [her home] and for the planting of flowers and shrubs." The complaint states that this parcel is bounded as follows: "Northwest: By land of Mark McKee, 51.9 feet; North: By land of Mark McKee, 27.5 feet; Northeast: By land of Mark McKee, 35.4 feet [and] South: By land now or formerly of Harriet Woodhouse 101 feet."

In response to the complaint, McKee pleaded a general denial, six special defenses and a counterclaim.[4]

---

[1] We do not reach the remaining claims.

[2] Initially, in its memorandum of decision, the court stated that the plaintiffs were the owners of 252 Durham Road, and McKee was the owner of 246 Durham Road. The record reveals the opposite to be true.

[3] The plaintiffs' amended complaint also stated a claim to quiet title by deed and for trespass. The court found for McKee on both of these claims, which are not the subject of this appeal.

[4] In his counterclaim, McKee alleged abuse of process, tortious interference and trespass. The trespass claim was based on the allegations that the

In the special defenses, McKee claimed that the plaintiffs' use of the disputed parcel was consensual, that no documents contradicted his title to the parcel, that there was no ouster of possession for the required fifteen years, that the well is on the plaintiffs' property and is not part of the disputed parcel, that the pertinent deeds and surveys all show that he owns the disputed parcel and that the plaintiffs have not placed any impediments on the parcel to oust him of his possession.

After a trial to the court, the court found that the plaintiffs' well was on their own land and not on the land of McKee and that the plaintiffs were encroaching, via the expansion of their driveway, onto McKee's property. This aspect of the court's judgment is unchallenged on appeal. Additionally, in its memorandum of decision, the court explained that "[t]he plaintiffs' adverse possession claim involves an area north of the disputed boundary which the plaintiffs allege they have used as their own since the 1930s. It is virtually entirely on the McKee parcel, and the total area is approximately triangular in shape. Two smaller triangular pieces surround a middle, trapezoidal shaped piece, with this latter section, 'the parking area,' being claimed as the area used for parking cars. The other two sections, 'the garden area,' are claimed as having been cultivated and tended as a garden. . . . A unique aspect of this dispute is that the defendant did not acquire title to his land until 1992. The McKee property and the plaintiffs' parcel were originally owned by one Archibald Young as part of a single parcel containing [approximately] thirty-five acres. In 1929, he sold all but what is now the plaintiffs' property."

plaintiffs were trespassing in using the well and parking area and in their enlargement of their driveway onto McKee's land. The court found in favor of McKee only on the part of his trespass claim concerning the enlargement of the plaintiffs' driveway. The counterclaim is not the subject of this appeal.

The court further found: "For the purposes of brevity and simplification, the court will adopt the plaintiffs' counsel's use of the term 'turnaround' to refer to the portion of the disputed area used for parking. The Woodhouse residence at 246 Durham Road was originally built as a summer cottage in 1928. Its driveway began at the turnaround and apparently crossed the property line onto what is now the McKee property, on its route to Durham Road. When a new driveway to Durham Road for 246 was constructed in the 1940s, the turnaround remained as the terminus.

"Harriet Woodhouse was the owner of 246 but conveyed title to her children, Pamela Benn and John Woodhouse. She reserved a life use for herself, so these three parties are the nominal plaintiffs. Mrs. Woodhouse was born in 1927 and spent summers at the then newly built cottage during the 1930s and 1940s. She testified that the turnaround had been used exclusively for turning around and parking cars of those visiting or residing at her house for 'as long as she can remember.'

"Pamela Benn recalled that the cottage was winterized in the 1970s, and other family members lived there. She testified that the turnaround was used as before by visitors and residents. John Woodhouse affirmed the testimony of Mrs. Woodhouse and Mrs. Benn. He spent summers there, starting in the 1950s, and was still a youth when he helped spread gravel in the turnaround and also the driveway.

"Two nonfamily witnesses gave testimony supporting the plaintiffs' position. Betty Clore and Diana Lennox were tenants at the house and property, now Mr. McKee's, in the 1960s.

"Mrs. Woodhouse's mother planted the garden area over fifty years ago, and it was her testimony that it has been maintained up to the time Mr. McKee objected to its maintenance. (The defendant claims he asserted

his ownership in 1992 [but] the plaintiffs claim no such objection occurred until 2003.) Hydrangea and forsythia were introduced by Mrs. Benn and Mrs. Woodhouse. Mr. Woodhouse testified that as a youth, his chore was to weed, spray and cut overgrowth in the garden and rake the turnaround.

"The defendant offered no rebuttal evidence to the plaintiffs' evidence as to the use and maintenance of the area in dispute. In fact, the defense appears to rely on the argument that Mr. McKee acquired his title in 1992 and gave permission to a [companion of Mrs. Woodhouse] to park on the turnaround. He blocked the area in 2003, and, therefore, no fifteen years of open, hostile and uninterrupted possession took place as to him. This premise ignores the history of the two properties . . . .

"The possession of the premises in dispute was certainly open, visible and exclusive. No one other than the plaintiffs, their family, guests and residents used the area. Nor can the defendant claim this possession to be invalid because the area was wooded and sparsely populated. There was a house on the present McKee property during the periods in question. Tenants there testified as to the use of the area by the plaintiffs. There was also foot traffic between the two houses and for a time, the Woodhouse driveway was shared by residents of 246. The turnaround was the terminus of the driveway then as it is now. . . .

"Further, the plaintiffs never sought permission of the owner, and there was no evidence of the same being extended by an owner until Mr. McKee's alleged consent in 1992. Mrs. Woodhouse stated that she always believed she had the right to use these areas, [and] she [did not] feel she needed anyone's permission. Mrs. Benn testified that she felt she had the right to park there, and no one ever opposed her use and cultivation

of the respective sections. Thus, the plaintiffs have satis-fied the requirements of our case law. . . .

"As noted [previously], the plaintiffs have proven their claim and established adverse possession for a period far in excess of the required fifteen years. Con-servatively, the court finds that possession ran from the 1940s at the least to Mr. McKee's acquisition date of July 24, 1992. By his own testimony, he gave permis-sion to [the companion of Mrs. Woodhouse] to park in the turnaround in the fall of 1992, an even later date." (Citations omitted.).

On the basis of these findings, the court concluded that "the plaintiffs have proved by clear and convincing evidence that they have acquired title to the disputed area, including both the turnaround and garden area." The court then ordered: "For the purposes of this judg-ment, the plaintiffs' exhibit nine [a survey map prepared by Derrick R. Schull of Schull Associates, Inc.] is found to best reflect the intention of the court and the most efficient way to prepare the new property lines for recording.[5] Counsel are ordered to consult on this issue and to prepare the descriptions unless they agree that a plot plan filing is preferred. Absent agreement within thirty days of [October 4, 2004], the court will prepare descriptions of its own."[6] This appeal followed.

McKee claims that the court improperly concluded that the plaintiffs had presented clear and convincing evidence of adverse possession. Specifically, he claims

---

[5] However, the court did not accept the boundary line as stated on the Schull Associates, Inc., survey map, which showed the plaintiffs' well on McKee's property. Instead, the court accepted the boundary line as set forth in a survey prepared by John D. Conklin of Conklin & Soroka, Inc., which showed that an additional 1.8 foot wide strip, which contained the Wood-house well, actually was part of the plaintiffs' property.

[6] There is nothing in the record to demonstrate that a description has been prepared by the parties or by the court, and McKee states that such a description has not been prepared.

that there was no evidence presented that proved that the plaintiffs' use of the disputed area was adverse or hostile. In contrast, he argues, the evidence demonstrates that the use was permissive and consensual from its inception. We agree.

"[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner. . . . A finding of adverse possession is to be made out by clear and positive proof. . . . The burden of proof is on the party claiming adverse possession. . . . Despite that exacting standard, our scope of review is limited. Adverse possession is a question of fact, and when found by the trial court will not be reviewed by this court as a conclusion from evidential facts, unless it appears that these facts, or some of them, are legally or logically necessarily inconsistent with that conclusion." (Citation omitted; internal quotation marks omitted.) *Provenzano* v. *Provenzano*, 88 Conn. App. 217, 221–22, 870 A.2d 1085 (2005).

Here, the court specifically found that "[t]he McKee property and the plaintiffs' parcel were originally owned by one Archibald Young as part of a single parcel containing about thirty-five acres. In 1929, he sold all but what is now the plaintiffs' property." The record clearly shows this finding to be accurate. Reviewing the deeds in evidence, the chain of title, especially as to the Woodhouse property, is clear. On July 26, 1929, Young granted to John Kettles and Mary Kettles 35.5 acres more or less, reserving to himself a portion of the property, which was bounded as follows: 150 feet of frontage on the state road; 225 feet in the rear; southerly 400 feet from the state road to the rear line. On November 23, 1935, Young granted to Dorothy Young Kirk these two

remaining acres with the following bounded description: Westerly 150 feet by N. Madison Road; Northerly 400 feet by the land of John Kettles; Easterly 225 feet by the land of John Kettles and Southerly 400 feet by the land of Mary Stannard. On December 26, 1967, it was recorded on the land records that Dorothy Young Kirk quitclaimed this parcel to Harriet Woodhouse. On August 10, 1979, it was then recorded on the land records that Harriet Woodhouse quitclaimed this property back to Dorothy Young Kirk. On December 16, 1983, it was recorded that Dorothy Young Kirk quitclaimed this property back to Harriet Woodhouse, and on November 20, 2003, it was recorded that Harriet Woodhouse quitclaimed one-half of her interest in this property to John Woodhouse and the remaining one-half interest to Pamela Woodhouse Benn.

John Woodhouse testified that his parcel had remained in his family: Young was his great grandfather; Mary Kettles was Young's daughter, and John Kettles was Mary's husband; Dorothy Young Kirk was Young's other daughter and John Woodhouse's own grandmother and Harriet Woodhouse's mother; Harriet Woodhouse is John Woodhouse's and Benn's mother. Accordingly, the evidence is clear that both parcels were once owned by the same person, Young, and that he divided the property and eventually transferred all of his interest to his children, with Dorothy Young Kirk acquiring title to what is now the plaintiffs' property, and Mary Kettles and John Kettles acquiring title to what is now McKee's property. The Woodhouse property remained in the possession of the descendents of Young, but the McKee property eventually became owned by nondescendents.[7] The original familial owner-

---

[7] On July 24, 1992, McKee purchased his property from William Plunkett, who, that same day, had obtained this property and an adjacent piece of property from Gerard W. Smith. McKee testified that he was told that Smith was a relative of the Woodhouses. There is nothing in the record, however, that fully explains the chain of title to the McKee property between the time

ship of these adjacent properties directly affects the analysis of McKee's claim that the use of the disputed area was permissive and not hostile or adverse. Additionally, much of the testimony offered by the plaintiffs supports McKee's contention that the use had been permissive.

John Woodhouse and Harriet Woodhouse both testified that their family used to own both pieces of property, that the driveway to their house used to come from the area of the property that is now owned by McKee and that both parcels used to share the same driveway. The terminus of that shared driveway was the disputed area. It was not until the 1940s that a new driveway was installed on the plaintiffs' property. That new driveway joined part of the old driveway and continued to terminate at the disputed area. John Woodhouse also testified that he knew that the disputed area belonged to the other parcel and that his mother had informed him of this fact when he was a boy; but that there was never a question concerning their use of the area. He testified that "nobody ever said [they] could use it or [they] couldn't use it. It was—it was an area that [they] just used." Harriet Woodhouse similarly testified that no one had ever given them permission to use the disputed area, nor had anyone ever told them that they couldn't use the area. Further, they had never asked anyone for permission; they simply continued to use the area. Benn also testified that "[n]obody ever said that we could or couldn't [park in the parking area]. We—that's just what we always did."

On the basis of this testimony and the record deeds, it is clear that the property once was owned entirely by Young and was separated or subdivided, and the

Young transferred ownership to John Kettles and Mary Kettles and when Smith transferred ownership to Plunkett.

separate parcels were transferred to his children. By the plaintiffs' testimony, both parcels shared the same driveway, which was entirely on the McKee side of the property, at least until the 1940s, and both the new and the old Woodhouse driveways always terminated at the same point, i.e., at the disputed area.

Our resolution of this appeal directs us to the element of hostility, that is the absence of consent, license or permission to use the disputed area. Here, the court concluded that the plaintiffs had met their burden on this element by submitting clear and convincing evidence that they never had sought or obtained permission to use the area. However, the grantor-grantee and the parent-child familial transfer of the property to the plaintiffs or their predecessors in title, who until the 1940s used the driveway and its terminus on what is now the McKee property, created a presumption of permissiveness[8] not discussed by the court, for which no evidence of repudiation was presented by the plaintiffs.

To acquire title by adverse possession, the possession must be hostile from its inception. *Kramer* v. *Petisi*, 53 Conn. App. 62, 71, 728 A.2d 1097, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). "[T]he claimant's possession [must] be without license or consent of the

---

[8] We recognize that in prescriptive easement cases, our Supreme Court has held that "[i]n Connecticut, although the burden of proof is on the party claiming a prescriptive easement . . . there is no presumption of permissive use to be overcome. . . . All that is required is a showing by a fair preponderance of the evidence that the use was adverse." (Citations omitted.) *Reynolds* v. *Soffer*, 190 Conn. 184, 188, 459 A.2d 1027 (1983); see *Public Storage, Inc.* v. *Eliot Street Ltd. Partnership*, 20 Conn. App. 380, 385, 567 A.2d 389 (1989). These cases, however, are distinguishable both because they concern prescriptive easements and, more importantly, because they declare that an automatic presumption is not recognized in every case. Here, we recognize a presumption because of the grantor-grantee relationship and the initial parent-child familial relationship. See 3 Am. Jur. 2d 124, Adverse Possession § 44 (2002); id., 227, § 181; id., 238, § 195. It does not appear, however, that our Supreme Court has ever had the opportunity to consider this precise issue.

owner." (Internal quotation marks omitted.) *Lazoff* v. *Padgett*, 2 Conn. App. 246, 249, 477 A.2d 155, cert. denied, 194 Conn. 806, 482 A.2d 711 (1984). "In determining what amounts to hostility, the relation that the adverse possessor occupies with reference to the owner is important. If the parties are strangers and the possession is open and notorious, it may be deemed to be hostile. However if the parties are related, there may be a presumption that the use is permissive." 3 Am. Jur. 2d 124, Adverse Possession § 44 (2002). "It is a general principle that members of a family may not acquire adverse possession against each other in the absence of a showing of a clear, positive, and continued disclaimer and disavowal of title, and an assertion of an adverse right brought home to the true owner a sufficient length of time to bar the owner under the statute of limitations from asserting ownership rights. The existence of a family relationship between the parties will prevent or rebut a presumption of adverse holding." Id., 226–27, § 180.

Additionally, "[a]s a general rule, an adverse possession cannot be predicated on the possession of the parent as against a child. The possession by a parent of a child's land will not be deemed adverse to the child, and such possession will ordinarily be presumed to be permissive and not adverse. . . . In order that a possession by a parent against a child . . . may become adverse, the owner must have had some clear, definite, and unequivocal notice of the adverse claimant's intention to assert an exclusive ownership in the claimant." Id., 227, § 181. Likewise, in cases of a grantor-grantee relationship, "a grantor may, by adverse possession, acquire title to land which the grantor has conveyed . . . [but the] hostility of the grantor's holding must be brought to the grantee's attention in such manner as to put the latter on notice of the grantor's intention to occupy the property in the grantor's own right. Nothing

short of an explicit disclaimer of the subservient relation of a grantor to a grantee and a notorious assertion of right in the grantor will be sufficient to change the character of the grantor's possession and render it adverse to the grantee." Id., 238, § 195.

Here, Young owned in unity both the plaintiffs' and McKee's land. In 1929, he divided that property and transferred what is now McKee's parcel to his daughter and son-in-law, Mary Kettles and John Kettles, reserving what is now the plaintiffs' property to himself. In 1935, he transferred his remaining interest in what is now the plaintiffs' property to his other daughter, Dorothy Young Kirk. The shared driveway, which was entirely on what is now McKee's property, was used by both parcels until the 1940s. Although Young, as grantor, transferred ownership of what is now McKee's property to Mary Kettles and John Kettles, the plaintiffs' testimony was that the shared driveway on the Kettles' parcel continued to be used to gain access to Young's parcel, and that this driveway terminated at the disputed area, which also was on the Kettles' parcel. These facts create a presumption that the use of the shared driveway, including its terminus, initially was permissive, both because of the parent-child familial relationship and because of the grantor-grantee relationship. This presumption never was rebutted by the plaintiffs, and, in fact, their testimony demonstrated that the presumptive permissive use never was repudiated. The use had always been sustained as it had begun; permission had never been given nor was it ever sought.

"[A] license in real property is a mere privilege to act on the land of another, which does not produce an interest in the property . . . ." (Internal quotation marks omitted.) *Top of the Town, LLC* v. *Somers Sportsmen's Assn., Inc.*, 69 Conn. App. 839, 845, 797 A.2d 18, cert. denied, 261 Conn. 916, 806 A.2d 1058 (2002). "[O]ne

who enters into the possession of land in subordination to the title of the real owner, is estopped from denying that title while he holds actually *or presumptively* under it. . . . As with a prescriptive easement, implied permission by the true owner is not adverse. . . . Although possession that is originally permissive may become hostile, it does so only if [the permission] is clearly repudiated by the occupant. 3 Am. Jur. 2d 149, Adverse Possession § 53 (1986); see also A. Sedgwick & F. Wait, Trial of Title to Land (1882) § 730, p. 508; R. Tyler, Law of Adverse Enjoyment (1876) p. 85. Such repudiation must be shown by some clear, positive, and unequivocal act brought home to the owner or the use will be presumed to be permissive. 3 Am. Jur. 2d 149, supra; A. Sedgwick & F. Wait, supra, § 749, p. 539; R. Tyler, supra, p. 877." (Citations omitted; internal quotation marks omitted.) *Top of the Town, LLC* v. *Somers Sportsmen's Assn., Inc.*, supra, 845–46.

"Possession that is permissive in its inception may become hostile. However, if the original entry is not hostile, it does not become so and the statute does not begin to run as against the rightful owner until the adverse claimant disavows the idea of holding for, or in subserviency to, another and actually sets up an exclusive right in the adverse claimant. If the original entry on land is by permission of the owner or under some right or authority derived from the owner, the possession does not become hostile until the permission or authority has been clearly repudiated by the occupant. To change the character of the possession from permissive to hostile, the disavowal of the record owner's title and the assertion of an adverse claim must be shown by some clear, positive, and unequivocal act brought home to the owner, such as an explicit disclaimer. Otherwise, the possession will not be presumed to be hostile." 3 Am. Jur. 2d 129, Adverse Possession § 50 (2002). This shift from permissive to

hostile possession must be proven by the claimant by clear and convincing evidence. See *Top of the Town, LLC* v. *Somers Sportsmen's Assn., Inc.*, supra, 69 Conn. App. 846.

Here, the court failed to consider the relevance of the initial grantor-grantee or parent-child familial use of the disputed area. Although it recognized that the property initially was owned by Young and then by his children, it did not consider the shared use of the driveway and the presumptive license given to the plaintiffs or their predecessors in title to use the disputed area, which the court acknowledged always was the terminus of the driveway, both the old shared driveway and the new driveway.

We conclude that the court's finding that the plaintiffs showed by clear and convincing evidence that they possessed title to the disputed area under a claim of right was legally and logically inconsistent with the evidence of an initial grantor-grantee, parent-child transfer that created a presumption that the original use was consensual and was never repudiated. Accordingly, the plaintiffs did not meet their burden of proof.

The judgment is reversed in part and the case is remanded with direction to render judgment for the defendant on the plaintiffs' claim of adverse possession.

In this opinion the other judges concurred.