******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DAVID VAICUNAS ET AL. *v.* REGINA R. GAYLORD ET AL.
## (AC 42251)

Lavine, Alvord and Keller, Js.

*Syllabus*

The plaintiffs, V and K, brought an action claiming, inter alia, that the defendants exerted undue influence on H to amend her trust, and a claim of adverse possession by V, against the defendants, M's heirs and R. H and her husband, F, owned four lots of certain real property, numbered 34 through 37. Their residence was located on lots 34 and 35. V's property abutted lot 37, which he used to store vehicles and to garden. V and K were F's and H's nephews and R was H's niece. After F died in 1998, H executed a trust whereby lots 34 through 36 were to be given to K and lot 37 was to be given to V. In 2003, H met M, and became close friends with M and his family. In 2010, H amended the trust and removed the provisions devising her real property to the plaintiffs and, instead, provided that the corpus of the trust, including lots 34 through 37, were to be distributed in equal shares to R and M. Following H's death, the plaintiffs became aware of the amended trust, and commenced the present action. V claimed that he gained title to lot 37 through adverse possession. The jury found in favor of the defendants as to the counts of undue influence and tortious interference, and in favor of V as to the count of adverse possession. Subsequently, the trial court set aside the verdict as to the count of adverse possession. On appeal, the plaintiffs claim, inter alia, that the trial court improperly set aside the jury verdict as to the count of adverse possession and abused its discretion in declining to admit the plaintiffs' offer of evidence as to H's character. *Held*:

1. The trial court did not abuse its discretion in setting aside the jury's verdict in favor of V as to the count of adverse possession because the verdict was unsupported by the evidence; contrary to the plaintiffs' claim, the trial court did not consider V's familial relationship with H and F to be determinative of V's lack of adverse possession but, relying on relevant case law, recognized that it was an important factor to be considered with other elements, the record sufficiently demonstrated that F and H knew of V's use of the lot and granted him permission for such use and that V failed to demonstrate that he prevented F and H from using the lot, and V's belief that he would inherit the land in the future did not support his claim that he possessed the land to the exclusion of the true owners and, therefore, V did not prove that he occupied the property under a claim of right, a required element on a claim of adverse possession.

2. The trial court did not abuse its discretion in denying evidence as to H's character in the form of V's opinion testimony in determining H's tendencies to take certain actions: the plaintiffs failed to provide any case law to support their proposition that a person's character was relevant if she was the subject of an undue influence claim and, even if H's character was relevant under the applicable provision (§ 4-5 (d)) of the Connecticut Code of Evidence, the appropriate method to prove undue influence would have been through the presentation of specific instances of her character, the plaintiff's reliance on the applicable provision (§ 4-4 (a) (2)) of the Connecticut Code of Evidence, which permits character evidence of a deceased person in a homicide case in which the accused claims self-defense, was also misplaced, as § 4-4 (a) (2) did not apply to the present matter; furthermore, even if the court improperly excluded V's opinion testimony, such error was harmless as the evidence would have been cumulative of other properly admitted testimony.

3. The plaintiffs could not prevail on their claim that the trial court improperly charged the jury as to the count of undue influence on the basis that the court improperly placed emphasis on the causation element; the portion of the charge in question merely summarized the plaintiffs' burden of proof with respect to the undue influence claim, was proper

and founded in controlling case law, and did not mislead or misguide the jury, and, although the plaintiffs claimed that the jury charge language was not supported by case law, the plaintiffs did not cite to any case law to support their claim.

Argued December 2, 2019—officially released April 7, 2020

*Procedural History*

Action to recover damages for, inter alia, undue influence, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Scholl, J.*; thereafter, the court directed a verdict for the defendants on the count of breach of fiduciary duty; verdict in part for the named plaintiff and in part for the defendants; thereafter, the court, *Scholl, J.*, granted the defendants' motion to set aside the verdict for the named plaintiff as to the count of adverse possession, and rendered judgment for the defendants, from which the plaintiffs appealed to this court. *Affirmed.*

*Stuart G. Blackburn*, for the appellants (plaintiffs).

*Edward G. McAnaney*, for the appellees (defendants).

*Opinion*

KELLER, J. The plaintiffs, David Vaicunas and Joseph Kobos, appeal from the judgment rendered by the trial court in favor of the defendants, Regina R. Gaylord, Kevin McGuire, Deborah Foster, John McGuire, and Scott McGuire, on the count of the complaint alleging undue influence exerted on Helen Rachel in amending The Helen K. Rachel Revocable Trust Indenture. The plaintiffs also appeal from the judgment of the trial court rendered after it granted the motion by the defendants to set aside the jury's verdict in favor of Vaicunas on the count for adverse possession of certain real property owned by Helen Rachel. On appeal, Vaicunas claims that the court improperly set aside the jury verdict with respect to adverse possession, and both plaintiffs claim that the court (1) abused its discretion by declining to admit the plaintiffs' offer of evidence as to the character of Helen Rachel, which was relevant to their claim for undue influence and (2) improperly charged the jury on the law of undue influence. We conclude that the trial court properly set aside the verdict on the claim for adverse possession and, as to the plaintiffs' claim of undue influence, we reject their assertions of evidentiary and instructional error on the part of the court. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to our consideration of the plaintiffs' appeal. Frank Rachel and Helen Rachel (Rachels), who were husband and wife, owned four lots of real property on Webb Street in Windsor Locks. The lots are numbered 34, 35, 36, and 37, running east to west on the north side of Webb Street. The Rachels' residence was located on lots 34 and 35. Lots 34, 35, 36, and 37 are known as 60 Webb Street. Vaicunas' residence was located on lots 38 and 39 (known as 68 Webb Street), and his property abutted lot 37. Vaicunas and Kobos were the Rachels' nephews. Gaylord was the Rachels' niece.

Gaylord had a close relationship with the Rachels, which included assisting them with shopping, banking, and arranging their financial and legal affairs. After Frank Rachel's death, Gaylord continued to assist Helen Rachel with such affairs.

Vaicunas also had a close relationship with the Rachels for much of their lives. He and his wife, Doreen Pilotte, lived next door to the Rachels from 1988 until their deaths. Vaicunas visited regularly with the Rachels during this time period.

Frank Rachel died in 1998. On March 24, 1999, Helen Rachel, with the assistance of her attorney, George Bickford, executed The Helen K. Rachel Revocable Trust Indenture (1999 trust). The 1999 trust designated Gaylord as successor trustee. Helen Rachel placed the title to her real property in the 1999 trust and, pursuant

to the trust, lots 34, 35, and 36 on Webb Street in Windsor Locks were to be given to Kobos upon Helen Rachel's death. The 1999 trust also provided that lot 37 was to be given to Vaicunas upon Helen Rachel's death if he survived her and if he still owned 68 Webb Street (lots 38 and 39), at the time of her death. If either of those conditions were not met, the trust provided that lot 37 was to be given to Kobos. The 1999 trust also left all personal property,[1] the balance of the trust corpus, and any accumulated income to Gaylord.

Helen Rachel met Gary McGuire[2] in 2003. McGuire drove a van for the senior center frequented by Helen Rachel. Helen Rachel became close friends with McGuire and his family, as she began to attend holiday and family gatherings at McGuire's residence. Helen Rachel referred to McGuire as the son she never had, and she treated McGuire's grandchildren as if they were her own grandchildren. Helen Rachel divulged to members of the McGuire family that she was not happy with her nephew, Vaicunas.

Helen Rachel suffered a stroke on October 20, 2009. As a result of the stroke, Helen Rachel experienced expressive aphasia, which manifested as a loss of the ability to speak. Helen Rachel also lost most of her motor skills on the right side of her body, which affected her ability to write. Helen Rachel continued, however, to communicate after her stroke by nodding or shaking her head in response to questions.

On February 11, 2010, Helen Rachel, with the assistance of Bickford, executed the first amendment to the 1999 trust (2010 trust). The 2010 trust removed the provisions devising Helen Rachel's real property to Vaicunas and Kobos and, instead, provided that the balance of the trust corpus, including lots 34, 35, 36, and 37, be distributed in equal shares to Gaylord and McGuire. Prior to executing the 2010 trust, Bickford communicated with Helen Rachel and confirmed that she was aware of the changes and that the changes were being made at her direction. Bickford met with Helen Rachel on three occasions before she executed the changes and communicated with her at each meeting. Bickford communicated with Helen Rachel by asking her questions and eliciting yes or no responses, until he arrived at an answer. At one of the meetings, Helen Rachel communicated to Bickford that she had been intending to make these changes to her trust for three years. Neither the plaintiffs nor the defendants were present at the meetings between Bickford and Helen Rachel.

In December, 2010, Vaicunas initiated a conservatorship proceeding in Probate Court with the goal of becoming Helen Rachel's conservator. The court denied Vaicunas' petition and the proceedings terminated on March 24, 2011.

McGuire's friendship with Helen Rachel continued after her stroke. Helen Rachel continued to celebrate with the McGuires at holiday and family gatherings. Similarly, Gaylord continued to assist Helen Rachel with her legal, medical, and personal affairs following her stroke. McGuire died on August 3, 2013. After McGuire's death, members of the McGuire family continued to maintain a relationship with Helen Rachel. Helen Rachel eventually was moved to a nursing home where she remained until her death on May 26, 2014.

Following Helen Rachel's death, the plaintiffs learned of the 2010 trust and initiated the present action against the defendants. The plaintiffs filed a complaint on September 11, 2014, sounding in two counts: undue influence brought against all defendants and breach of fiduciary duty brought against Gaylord. On April 16, 2015, the plaintiffs filed an amended complaint, adding a count of tortious interference with an expectation of inheritance brought against Gaylord. On September 28, 2016, the plaintiffs filed an additional amended complaint adding a count of adverse possession by Vaicunas alone. A jury trial was held on October 10, 11 and 12, 2018. Following the presentation of evidence, and prior to the jury's deliberations, counsel for the defendants moved for a directed verdict on all four counts. The court granted the motion for a directed verdict only as to the count alleging breach of fiduciary duty. The jury then found in favor of the defendants as to the counts of undue influence and tortious interference, and in favor of Vaicunas as to the count of adverse possession. On October 25, 2018, the defendants moved to set aside the jury's verdict as to the count of adverse possession, arguing that the verdict was contrary to the law and unsupported by the evidence. On November 2, 2018, the court heard arguments from the parties on the motion. On December 7, 2018, the court granted the defendants' motion to set aside the jury's verdict on the count of adverse possession and ordered that judgment on that count be directed for the defendants. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiffs first claim that the court improperly set aside the jury verdict on the count of adverse possession. We disagree.

The record reveals evidence of the following relevant facts. From approximately 1989 through the time of the trial, Vaicunas used lot 37 on a daily basis. Specifically, he parked vehicles, split, stacked, and stored firewood, gardened, mowed the grass, and tended to snow removal.

Vaicunas, however, was not the only individual to use lot 37 during the relevant time period. When Vaicunas and Pilotte lived next door to the Rachels, "[they]

just were always together. [They] crossed lots all the time, [Helen Rachel] or [Vaicunas and Pilotte]." Further, Frank Rachel and Vaicunas gardened together on lot 37 before Frank Rachel's death in 1998. Helen Rachel also traversed lot 37 to pick tomatoes from the garden. Additionally, in 2009, Helen Rachel hired a landscaper, Kevin McGinnis, to tend to her Webb Street property. From 2009 until the time of trial, McGinnis mowed lot 37 on a biweekly basis during the growing season and performed fall and spring cleanup. Helen Rachel paid McGinnis for the landscaping services until her death, whereupon Gaylord, as the executrix to Helen Rachel's estate, began paying McGinnis. McGinnis mowed the grass on lot 37, going as far onto the lot as was possible due to the location of the garden and the vehicles that Vaicunas had parked on the property. On occasion, Vaicunas would come out of his residence, which was adjacent to lot 37, and observe McGinnis mowing the grass on lot 37. Vaicunas never spoke to McGinnis nor erected any fences or barriers to prevent McGinnis from tending to lot 37.

After Frank Rachel's death, Charles Gaylord, Gaylord's son, helped Helen Rachel clean up the Rachels' property and take some items to the dump. Charles Gaylord saw some items in the backyard and asked Helen Rachel if he should take them to the dump as well. Helen Rachel told him that the possessions belonged to Vaicunas and that Frank Rachel had permitted him to keep them on lot 37. She seemed to imply that she would similarly allow Vaicunas to keep the items on lot 37. Frank Rachel was "okay" with Vaicunas' use of lot 37 and both Frank Rachel and Helen Rachel agreed to the use.

On multiple occasions, Vaicunas discussed with Frank Rachel and Helen Rachel the distribution of lots 34 through 37 on Webb Street after their deaths. As a result of these discussions, Vaicunas understood that the Rachels would distribute lots 34, 35, and 36 to Kobos, and lot 37 to Vaicunas. Prior to Helen Rachel's death, Vaicunas also saw testamentary documents which directed distribution of her property.

On the motion to set aside the verdict in favor of Vaicunas as to the adverse possession claim, the defendants argued that Vaicunas failed to present evidence as to a number of the elements of adverse possession. In particular, they argued that Vaicunas did not prove that his use of the property was exclusive, that he ousted the Rachels from the property, that his use of the property was without permission, or that he occupied the property under a claim of right. The court, after reviewing the evidence, agreed with the defendants and authored a memorandum of decision setting aside the jury verdict in favor of Vaicunas as to the adverse possession claim. The grounds on which the court granted the motion mirrored the arguments set forth by the defendants.

We begin by setting forth the applicable standard of review. "The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. . . . [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . In reviewing the action of the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion. . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Citations omitted; internal quotation marks omitted.) *Hall* v. *Bergman*, 296 Conn. 169, 179, 994 A.2d 666 (2010).

"The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner." (Internal quotation marks omitted.) *Kramer* v. *Petisi*, 53 Conn. App. 62, 67, 728 A.2d 1097, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). Further, the plaintiff bears the burden of proving adverse possession "by clear and convincing evidence." (Internal quotation marks omitted.) Id.

After conducting a careful review of the evidence produced at trial, we agree with the trial court that the evidence was insufficient to support the jury's finding that Vaicunas acquired title to lot 37 through adverse possession.

In setting aside the verdict, the court relied, in part, on the familial relationship between Helen Rachel and Vaicunas. In order to obtain property through adverse possession, the possession must be hostile, which is the absence of consent, license, or permission. See *Woodhouse* v. *McKee*, 90 Conn. App. 662, 672, 879 A.2d 486 (2005). Further, the possession of the property in question must be hostile from its inception. Id. "In determining what amounts to hostility, the relation that the adverse possessor occupies with reference to the owner is important. If the parties are strangers and the posses-

sion is open and notorious, it may be deemed to be hostile. However if the parties are related, there may be a presumption that the use is permissive. . . . It is a general principle that members of a family may not acquire adverse possession against each other in the absence of a showing of a clear, positive, and continued disclaimer and disavowal of title . . . . The existence of a family relationship between the parties will prevent or rebut a presumption of adverse holding." (Citation omitted; internal quotation marks omitted.) Id., 673.

"Historically, the existence of a familial relationship between claimants has been [only] a factor in determining whether possession of land is adverse. . . . A family relationship between parties is only one of the facts to be considered [with other facts]. . . . [A] family relationship without more is insufficient to support a finding that the use at the time was with permission. . . . [S]tanding alone a familial relationship neither puts an end to the inquiry regarding permissive use nor shifts the burden of proof. . . . Nevertheless, the familial relationship may be an important factor when evaluated in the context of all the other relevant factors guiding the [c]ourt in its resolution of the . . . claim." (Citations omitted; internal quotation marks omitted.) *Mulle* v. *McCauley*, 102 Conn. App. 803, 814–15, 927 A.2d 921, cert. denied, 284 Conn. 907, 931 A.2d 265 (2007).

Here, the court did not, as the plaintiffs claim in their brief, consider the familial relationship to be determinative of Vaicunas' lack of adverse possession of the property but, rather, relying on the relevant case law, recognized that it was an "important factor" to be considered in conjunction with the other elements of an adverse possession claim.

In addition to the presumption of permissive use, which arose by virtue of the familial relationship, the court also looked to direct evidence that supported the fact that Vaicunas occupied the property with license or consent of the owners. Both the plaintiffs and the defendants presented evidence demonstrating that Frank Rachel and Helen Rachel knew of Vaicunas' use of lot 37 and, in fact, granted him permission for such use. Charles Gaylord testified that Frank Rachel allowed Vaicunas to keep his possessions on lot 37, and that Helen Rachel implied that she would allow the same use. Additionally, Kobos testified at his deposition that Frank Rachel was "okay" with Vaicunas' use of the property and that Helen Rachel agreed to the use as well.

"Although possession that is originally permissive may become hostile, it does so only if [the permission] is clearly repudiated by the occupant. . . . Such repudiation must be shown by some clear, positive, and unequivocal act brought home to the owner or the use will be presumed to be permissive." (Citations omitted; internal quotation marks omitted.) *Woodhouse* v.

*McKee*, supra, 90 Conn. App. 675. Here, the evidence did not show that Vaicunas repudiated the permission granted to him by Frank Rachel and Helen Rachel to occupy lot 37. Therefore, Vaicunas' use of the property is presumed to have been permissive and at no point in time became hostile.

The evidence presented at trial also was insufficient to support the jury's finding that the Rachels were ousted from the property and that Vaicunas used lot 37 exclusively during the relevant time period. The plaintiffs merely presented evidence that Vaicunas used lot 37 on a daily basis from 1989 through the time of trial. The plaintiffs, however, in no way refuted the evidence presented by the defendants that demonstrated that during that time period Frank Rachel gardened on lot 37 until his death in 1998, Helen Rachel crossed lot 37 and went onto the lot to gather tomatoes from the garden, and that Helen Rachel directed and paid a landscaper, McGinnis, to tend to that particular lot. Further, Vaicunas did not erect any fences or physical barriers in an effort to keep the Rachels out of possession of the property. The fact that the Rachels used lot 37 throughout the time period that Vaicunas claims to have used the property exclusively defeats his claim of adverse possession.

Further, the evidence was insufficient to prove that Vaicunas occupied the property under a claim of right. In *Brander* v. *Stoddard*, 173 Conn. App. 730, 745–48, 164 A.3d 889, cert. denied, 327 Conn. 928, 171 A.3d 456 (2017), this court upheld the decision of the trial court that "[t]he possession of one who recognizes or admits title in another, either by declaration or conduct, is not adverse to the title of such other. . . . Occupation must not only be hostile in its inception, but it must continue hostile, and at all times during the required period of fifteen years challenge the right of the true owner, in order to found title by adverse use upon it. . . . Such an acknowledgement of the owner's title terminates the running of the statutory period. . . . The plaintiff's belief that he would inherit the land in the future does not support a belief that he presently possessed the land to the exclusion of the true owners . . . ." (Citations omitted; internal quotation marks omitted.)

Similarly, in the present case, as a result of discussions that Vaicunas had with Frank Rachel and Helen Rachel, he understood that lot 37, "which was in [Frank Rachel's and Helen Rachel's names]," would be distributed to him upon their deaths. Vaicunas' clear acknowledgement of Frank Rachel's and Helen Rachel's title to lot 37 and his expected inheritance of the property, contradicts his assertion that he possessed the land to the exclusion of the true owners. Therefore, Vaicunas did not prove that he occupied the property under a claim of right, as is required to prevail on an adverse

possession claim.

On the basis of the foregoing, we conclude that the trial court did not abuse its discretion in setting aside the jury's verdict in favor of Vaicunas as to the count of adverse possession because that verdict was unsupported by the evidence.

II

Next, the plaintiffs claim that the court abused its discretion by declining to admit the plaintiffs' offer of evidence as to the character of Helen Rachel.

The following additional facts are relevant to this claim. During the direct examination of Vaicunas, the plaintiffs' counsel sought to elicit testimony from Vaicunas regarding the character of Helen Rachel. Specifically, counsel for the plaintiffs asked the following question with regard to the 2010 amendment Helen Rachel made to her trust:

"Q. Would making a change like this—based on your knowledge of your aunt and your dealings with her over the years, would making a change like this be something she would do out of her free will?"

Counsel for the defendants objected to this question and the court heard argument from counsel outside the presence of the jury. Counsel for the plaintiffs argued that "[Helen] Rachel's character and her tendencies that she may have [had] for taking certain actions are really at the heart of a number of these issues in this case and I believe someone as familiar with her character and her traits as . . . Vaicunas should be permitted to testify concerning them in whether these actions are consistent or inconsistent with that character." Specifically, counsel for the plaintiffs argued that Helen Rachel's character was at issue because of the undue influence claim. Counsel for the defendants argued that Helen Rachel's character was not at issue and that to permit Vaicunas to testify as to whether, in his opinion, the 2010 trust amendment was something she would do of her own free will would allow the plaintiffs to impermissibly introduce an opinion. The court agreed with the defendants and sustained the objection. Similar to the arguments that the plaintiffs advanced before the trial court, the plaintiffs claim before this court that "Helen Rachel's character was relevant to the jury's determination of whether she was unduly influenced." In particular, the plaintiffs argue before this court that "[t]he jury was entitled to hear the opinions of her relatives about whether [Helen] Rachel was susceptible to influence and whether changing the trust documents was consistent with her character." The plaintiffs submit, therefore, that the court improperly excluded character evidence of Helen Rachel in the form of Vaicunas' opinion.

We begin by setting forth the applicable standard of review. "The trial court's ruling on the admissibility of

evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [appellant] of substantial prejudice or injustice. . . . Additionally, even when an evidentiary ruling is improper, the [appellant] bears the burden of demonstrating that the error was harmful. . . . One factor to be considered in determining whether an improper ruling on evidence is a harmless error is whether the [evidence] was cumulative . . . ." (Citation omitted; internal quotation marks omitted.) *Anderson* v. *Poirier*, 121 Conn. App. 748, 751, 997 A.2d 604, cert. denied, 298 Conn. 904, 3 A.3d 68 (2010).

Having examined the plaintiffs' claim, we conclude that the court properly declined to admit Vaicunas' testimony as to Helen Rachel's character. Pursuant to § 4-4 of the Connecticut Code of Evidence, the general rule is that "[e]vidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion . . . ."[3] Section 4-5 (d) of the Connecticut Code of Evidence, however, permits character evidence in the form of specific instances of a person's conduct "[i]n cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue . . . ."

At trial, counsel for the plaintiffs seemed to conflate the manner in which character evidence can be presented under §§ 4-4 and 4-5 of the Connecticut Code of Evidence. He argued that the undue influence claim put Helen Rachel's character at issue, and, therefore, "one of the methods that I can prove character or reputation when character is an issue is by a personal opinion of someone who is familiar enough with the person." In their brief, the plaintiffs did not cite to a single case to support the proposition that a person's character is relevant if he or she is the subject of an undue influence claim. It appears to us that the plaintiffs were, in reality, attempting to describe Helen Rachel's personality trait of being a person susceptible to easy influence, rather than adduce evidence of her character. However, even if Helen Rachel's character were relevant, under § 4-5 (d) the appropriate method to prove such character would be through the presentation of evidence of specific instances of her character, not by the presentation of opinion testimony, as counsel for the plaintiffs was attempting to do.

In their brief, the plaintiffs rely solely on *State* v.

*Maxwell*, 29 Conn. App. 704, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, 509 U.S 930, 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993), for the proposition that the character of a deceased person may be proved by opinion testimony. The plaintiffs' reliance is misplaced, however, because *Maxwell* involves one of the exceptions[4] in § 4-4 of the Connecticut Code of Evidence, and stands for the proposition that, "in a homicide prosecution where the accused has claimed self-defense, the accused may show that the deceased was the aggressor by proving the deceased's alleged character for violence. The deceased's character may be proved by reputation testimony [or] by opinion testimony . . . ." (Internal quotation marks omitted.) Id., 713. *Maxwell* clearly does not apply to the present case because § 4-4 (a) (2) is not applicable and, therefore, the plaintiffs' reliance on this case in no way furthers the plaintiffs' argument that the court should have admitted evidence in the form of opinion testimony.

Further, even if the court improperly excluded Vaicunas' opinion of Helen Rachel, such error was harmless. One factor that affects our harmless error analysis is whether the excluded evidence was cumulative of other properly admitted evidence. See *State* v. *Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014). Here, counsel for the plaintiffs elicited testimony from Vaicunas, which made the excluded evidence cumulative. Specifically, the following exchange occurred between counsel for the plaintiffs and Vaicunas during the direct examination of Vaicunas:

"Q. Did she have any tendencies to believe people?

"A. If you told her something, she believed it; doesn't matter what you told her.

"Q. Was she easily persuaded?

"A. Very easy. . . . [W]hen [Frank Rachel] was still alive if something was said she would always rely on [Frank Rachel] for a decision. But after he wasn't there she was on her own so very easy to persuade her to do just about anything." Given the similar nature of the aforementioned testimony and the excluded evidence in question, the court's decision to exclude the evidence, even if improper, was harmless because it would have been cumulative of other properly admitted testimony.

In light of the broad discretion possessed by the trial court in admitting evidence, we conclude that the court did not abuse its discretion in excluding character evidence as to Helen Rachel in the form of Vaicunas' opinion testimony.

### III

Finally, the plaintiffs claim that the court improperly charged the jury on the law of undue influence. The

plaintiffs argue that the jury charge on the claim of undue influence included a sentence that was improper and possibly misleading to the jury. We disagree.

The following additional facts are relevant to the plaintiffs' claim. On October 17, 2018, the court delivered the charge to the jury on the plaintiffs' three remaining counts.[5] After the court delivered the charge, counsel for the plaintiffs took exception to the last sentence of the undue influence charge, in which the court stated: "There must be proof not only of undue influence but that its operative effect was to cause [Helen] Rachel to make a trust [that] did not express her actual desires." Specifically, counsel for the plaintiffs questioned whether the sentence in question was supported by case law and argued that it was duplicative of other portions of the charge. Counsel for the plaintiffs also noted that, prior to the delivery of the charge, he had raised a similar concern regarding the language in question in chambers. The court responded that the relevant portion of the charge merely summarized an undue influence claim and that the court would not give any further instructions.

"Our standard of review concerning claims of instructional error is well settled. [J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jurors in guiding them to a proper verdict. . . . The trial court must adapt its instructions to the issues raised in order to give the [jurors] reasonable guidance in reaching a verdict and not mislead them." (Internal quotation marks omitted.) *Champeau* v. *Blitzer*, 157 Conn. App. 201, 211, 115 A.3d 1126, cert. denied, 317 Conn. 909, 115 A.3d 1105 (2015). "Therefore, [o]ur standard of review on this claim is whether it is reasonably probable that the jury was misled." (Internal quotation marks omitted.) *Farmer-Lanctot* v. *Shand*, 184 Conn. App. 249, 255, 194 A.3d 839 (2018).

In their brief, the plaintiffs argue that, by including the final sentence of the jury charge applicable to the undue influence claim, the court placed emphasis on the causation element and potentially misled the jury and misguided their determination of this claim. We agree with the court that the portion of the charge in question merely summarized the plaintiffs' burden of proof with respect to the undue influence claim, and that it in no way misled or misguided the jury. As part of their argument in opposition to the language of the instruction, counsel for the plaintiffs argued before the trial court, and in the plaintiffs' appellate brief, that the language is not supported by case law. The plaintiffs, however, fail to present a single case in support of this proposition. To the contrary, the questioned instructional language was taken almost verbatim from Connecticut case law governing claims of undue influence.

Specifically, this court, in *Bassford* v. *Bassford*, 180 Conn. App. 331, 355, 183 A.3d 680 (2018), stated, "[t]here must be proof not only of undue influence but that its operative effect was to cause the testator to make a will which did not express his actual testamentary desires." Accordingly, we conclude that the court delivered a charge that was proper and founded in controlling case law, and that it was not reasonably probable that the jury was misled by such charge.

The judgment is affirmed.

In this opinion, the other judges concurred.

[1] The 1999 trust provided that Helen Rachel's personal property was to be distributed by the trustee to Gaylord, after first adhering to any attached memorandum.

[2] Gary McGuire died prior to the commencement of the underlying action. The named defendants are McGuire's heirs. Subsequent references in this opinion to "McGuire" are to Gary McGuire.

[3] There are several exceptions to § 4-4 of the Connecticut Code of Evidence, none of which applies to the testimony that counsel for the plaintiffs sought to elicit. The exceptions are as follows:

"(1) Character of the accused. Evidence of a specific trait of character of the accused relevant to an element of the crime charged offered by an accused, or by the prosecution to rebut such evidence introduced by the accused.

"(2) Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused.

"(3) Character of a witness for truthfulness or untruthfulness. Evidence of the character of a witness for truthfulness or untruthfulness to impeach or support the credibility of the witness.

"(4) Character of a person to support a third-party culpability defense." Conn. Code Evid. § 4-4 (a) (1) through (4).

Under these exceptions, "in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of an opinion." Conn. Code Evid. § 4-4 (b).

[4] In *Maxwell*, the applicable exception was § 4-4 (a) (2) of the Connecticut Code of Evidence, which states: "Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused." Conn. Code Evid. § 4-4 (a) (2).

[5] The following portion of the jury charge is relevant to the claim of undue influence: "In the first count of their complaint, the plaintiffs claim that the 2010 amended trust was executed as a result of undue influence by the defendant, Regina Gaylord or Gary McGuire, over the will of [Helen] Rachel. The burden of proof of undue influence is on the plaintiffs. They must show by a fair preponderance of the evidence, as I have explained that phrase to you, that the influence was undue. Direct evidence of undue influence is often not available and you may rely on circumstantial evidence as I have instructed you earlier. But the plaintiffs' suspicions alone are not enough. Influence or fair persuasion of Helen Rachel by Gaylord or McGuire is acceptable.

"Undue influence is the exercise of sufficient control over a person whose acts are brought into question in an attempt to destroy her free agency and constrain her to do something other than she would do under normal control. There are four elements of undue influence: one, a person who is subject to influence; two, an opportunity to exert undue influence; three, a disposition to exert undue influence; and, four, a result indicating undue influence.

"Relevant factors you can consider include [Helen] Rachel's age and physical and mental condition, whether she had independent or disinterested advice in the transaction, whether she was under any distress, her predisposition to make the transfer in question, the extent of the transfer in relation to her whole worth, active solicitations and persuasions by the other party, and the relationship of the parties. There must be proof not only of undue influence but that its operative effect was to cause [Helen] Rachel to make

a trust which did not express her actual desires."

———————————————